# Exhibit 3

EFiled:  Jan 15 2025 06:02PM EST
Transaction ID 75439333
Case No. N25C-01-266 FJJ

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

```
------------------------------------------- X
TOPTAL, LLC                                 :
                                            :       Case No.
        Plaintiff,                          :
                                            :       JURY TRIAL DEMANDED
v.                                          :
                                            :
BLOOMBERG L.P.                              :
                                            :
        Defendant.                          :
------------------------------------------- X
```

## COMPLAINT

1.      This defamation action arises out of Defendant Bloomberg L.P.'s publication, on April 24, 2024, of a false and disparaging article about Toptal, LLC headlined "Battle Over Startup Leaves Early Investor With No Equity, $2.6 Million Legal Bill." (the "Article").

2.      On the same day that Bloomberg published the Article, Bloomberg also published an opinion column headlined "The FTC Comes for Noncompetes" (the "Opinion Column") which re-published, and thus further disseminated, several of the defamatory statements in the Article and continued a false narrative that Toptal had reneged on its agreements with a particular individual and deprived him of an equity interest to which he was otherwise entitled.

3.      Toptal is the "startup" referenced in the Article's headline.  Toptal's founder and sole member is Taso Du Val.  Since its founding in 2010, Toptal has

1

connected businesses with freelancers such as software engineers, designers, and business consultants. Toptal's "early investor" as referenced in the Article's headline is Denis Grosz, an individual who, in 2012, loaned money to Toptal.

4.      The false theme of the Article is that Toptal wronged Grosz by rejecting his request to convert his Toptal loan to an equity ownership interest. That theme is expressed in various statements, which impliedly and overtly communicate the false notion that Grosz was entitled to obtain equity in Toptal, which it somehow cheated him out of acquiring.

5.      The Article communicates this theme while *purporting* to report on the result of a lawsuit brought by Toptal in Nevada state court (the "Nevada Action"), but the result of the Nevada Action is the ***complete opposite*** of the impression that would be understood by a reader of the Article.  That is, while the Article portrays Toptal as having victimized Grosz, the factual and legal conclusions of the jury and court in the Nevada Action were instead that Grosz and a company he owned, Mechanism Ventures, LLC, victimized Toptal through a multi-faceted, multi-year conspiracy led by Grosz that sought to bankrupt Toptal.

6.      Indeed, in denying post-trial motions filed by Grosz and Mechanism, the Nevada Court found that "***[t]he evidence at trial revealed a deliberate, purposeful plot – committed to writing – to attack Toptal, with the ultimate goal***

2

*of bankrupting the company*," and wrote that "*Toptal introduced a significant amount of evidence revealing a plot to bring down Toptal led by Mr. Grosz*."

7.      In fact, the jury determined that Mechanism had acted with malice, oppression, or fraud and that punitive damages were warranted as a result.  The Nevada Court affirmed the awarding of punitive damages against Mechanism (although it decreased the amount of the jury's punitive damage award) because the jury's finding that "Mechanism acted with malice, oppression, or fraud," was "supported by the evidence."

8.      The Nevada Action exonerated Toptal and Du Val from **all counterclaims *and* all affirmative defenses**. The result of the Nevada Action leaves no room for a neutral reporter to endorse the notion that Toptal and/or Du Val deprived Grosz of any contractual right or otherwise acted in bad faith. These points have been resolved and concluded by the Nevada Court and unanimous jury verdict.

9.      Thus, the Nevada Action resulted in a resounding win for Toptal against Grosz and Mechanism, with Toptal being awarded both compensatory and punitive damages.  But the Article, in misstating the nature and genesis of the dispute, and the result of the Nevada Action, portrayed Toptal as the bad actor and Grosz/Mechanism as victims of Toptal, whereas the court in the Nevada Action ruled that the opposite was true: Toptal had been victimized by Grosz and

3

Mechanism and Toptal had brought the Nevada Action to protect itself. The Article's complete distortion of the record and of the court's decisions in the Nevada Action have injured Toptal's reputation and financial and business prospects.

10.    Similarly, the Opinion Column expresses the general and inaccurate notion that individuals who purchase convertible promissory notes are entitled to obtain equity in the issuer of the note, and then goes on to falsely suggest that Grosz had such a right to convert his loan to Toptal into equity – of which he was purportedly, wrongfully deprived.

11.    Toptal initiated the Nevada Action after Grosz and Mechanism engaged in a smear campaign designed to financially harm Toptal and bring it to the brink of financial ruin as retribution for Toptal's refusal to negotiate the terms of a previously agreed-upon binding contract between Toptal and Grosz.[1]  The Nevada Court found that, as part of that campaign, Grosz "groomed" a reporter to "write a negative article about Toptal."  Put simply, Grosz became dissatisfied with the contractual agreement he had with Toptal and instead of honoring the agreed-upon terms, he (as summarized by the Nevada Court) "orchestrated a negative

---

[1] Toptal initially asserted claims against only Grosz in the Nevada State Court Action.  It later amended its complaint to add claims against his wholly-owned company, Mechanism.

4

media campaign" to harm Toptal and weaken it to the point of bankruptcy, with the goal of forcing Toptal to offer him an equity interest to which he had no legal right.

12.    By initiating the Nevada Action and defending against the various counterclaims asserted by Grosz and Mechanism, Toptal sought, *inter alia*, to obtain damages for the harm caused it by Grosz and Mechanism and to clear its name and show that it had neither engaged in any unfair business practices nor deprived Grosz of any equity interests to which he was entitled.

13.    As reflected by the summary judgment decisions issued by the Nevada Court, the jury verdict rendered after trial, and the Nevada Court's post-trial decisions, the Nevada Action was a resounding victory for Toptal, which obtained a money judgment against Grosz and Mechanism as compensation for Toptal's actual losses as well as punitive damages due to the egregious misconduct by Grosz's company, Mechanism.  The Nevada State Court also rejected Grosz and Mechanism's various counterclaims, and among other things, held that Grosz was not contractually entitled to any equity in Toptal *as a matter of fact and law*. Thus, the Nevada Action resulted in judicial findings and a jury verdict which determined that Grosz and Mechanism had harmed Toptal, and flatly rejected Grosz's claim that he was somehow cheated out of an equity stake in Toptal.

14.    Toptal was thus thoroughly vindicated as the prevailing party in the Nevada Action, including on the various counterclaims that Grosz brought against

it and its sole member, Taso Du Val, to the point that the jury awarded $15 million in punitive damages against Mechanism. However, the Article and Opinion Column conveyed the opposite — that Toptal had reneged on its contractual obligations and deprived Grosz of an equity interest to which he was entitled.

15. The Article and Opinion Column created and continue to perpetuate the false image of Toptal as a company which does not honor its contractual obligations and seeks to wrongfully extract financial rewards for itself at the expense of its business partners. This false impression created by the Article inflicted significant harm on Toptal's reputation and was not ameliorated by Bloomberg's later inadequate attempt to revise the Article and Opinion Column in response to Toptal's complaints, *see infra* at ¶¶ 116-125; 128-129.

16. Additionally, the defamatory statements in the Article and Opinion Column had the practical effect of erasing the reputational gains Toptal had managed to achieve through its success in the Nevada Action, and instead caused Toptal to be perceived negatively by readers whose understanding of the dispute between Toptal and Grosz was a function of what they read about Toptal in the misleading Article and Opinion Column.

## PARTIES AND RELEVANT NON-PARTIES

17. Plaintiff Toptal, LLC ("Toptal") is a Delaware single member limited liability company. Toptal is a fully remote company: it has no physical offices

6

anywhere in the world and its personnel typically work from their own workspaces.

18.    Taso Du Val ("Du Val"), a New York resident, is Toptal's sole member.

19.    Defendant Bloomberg L.P. ("Bloomberg") is a Delaware limited partnership with its principal place of business in New York.  Bloomberg News, an international news agency headquartered in New York, is a division of Bloomberg.  Bloomberg News disseminates articles around the world through its website, mobile platforms, Bloomberg Terminals, Bloomberg Television, Bloomberg Radio, and printed materials.

20.    Sarah McBride is a reporter who writes for Bloomberg News.  On information and belief, McBride is a resident of California.  As relevant here, while working for Bloomberg, McBride authored an article which was originally published on Bloomberg.com on April 24, 2024 entitled "Battle Over Startup Leaves Early Investor With No Equity, $2.6 Million Legal Bill."

21.    Denis Grosz is an individual who in 2012 loaned money to Toptal pursuant to a Note Purchase Agreement and Convertible Promissory Note in which he was referred to as a "Lender."  Grosz also served as an advisor to Toptal pursuant to an Advisor Agreement entered into as part of the same transaction and on the same date as the Note Purchase Agreement and Convertible Promissory

7

Note.  On information and belief, Grosz was a resident of Nevada at the time of the 2012 transaction with Toptal and the commencement of the Nevada Action in 2020 — and is now a resident of Puerto Rico.

22.    Mechanism Ventures, LLC ("Mechanism") is a Delaware Limited Liability Corporation organized by Grosz in 2018.  On information and belief, Grosz was the sole member of Mechanism from its organization until some point in 2023 when he granted a one percent interest to his longtime business and life partner, Liza Yermakova, following their marriage in March 2023.

## FACTUAL ALLEGATIONS

23.    Bloomberg provides news reporting and other services to its readers who are located worldwide.

24.    Since its founding, Bloomberg's core audience has substantially consisted of individuals working in finance and business, including the financial services industry, many of whom make or direct financial investments.

25.    Recently, Bloomberg has been actively trying to expand its subscriber base.  As of June 2024, Bloomberg reported that it had 540,000 subscribers – an increase of approximately 40,000 in the prior six months.[2]

---

[2] https://pressgazette.co.uk/publishers/digital-journalism/bloomberg-media-rolls-out-website-upgrades-as-it-hits-540000-subscribers/

26.    Toptal was founded in 2010 as a single-member LLC.  At all times, Du Val has been Toptal's CEO and sole member.

27.    Toptal is a global, fully remote, company that curates and maintains a network of, among other things, freelance software developers, finance experts, and product managers.  Toptal (whose name is derived from the words "top talent") matches its network of talent with clients in the United States and around the world.

28.    In 2020, Toptal commenced the Nevada Action to recover for tortious harm and breaches of contractual obligations and to protect its business interests and reputation after Grosz and Mechanism engaged in a concerted campaign to harm Toptal.

29.    Grosz asserted various counterclaims against Toptal and Du Val in the Nevada Action.

30.    In 2023, Toptal was thoroughly vindicated in the Nevada Action when the court issued a series of summary judgment decisions, and the jury rendered a verdict in Toptal's favor.  The court decisions and the jury verdict resulted in the counterclaims against Toptal and Du Val being dismissed and Toptal being awarded damages (compensatory and punitive) against Grosz and Mechanism.

31.    The jury verdict was affirmed by the Nevada Court in post-trial decisions.

32.    However, Bloomberg then published the Article and the Opinion Column misleadingly portraying Grosz as the victim and Toptal as the culprit, creating the utterly false but significantly damaging misimpression that Toptal failed to honor contractual agreements with Grosz.

*Toptal's Early Efforts to Obtain Financing and Its Agreements with Grosz*

33.    In 2011 and 2012 Toptal received approximately $500,000 in financing from various third parties with whom it entered into note purchase agreements in which such third parties were clearly identified as lenders.

34.    The note purchase agreements in question set forth the conditions under which those notes could potentially be converted to equity.  The notes provided a guaranteed rate of interest and set forth maturity dates.

35.    These notes did not commit Toptal to grant – or entitle the holders to receive – equity in Toptal, absent the occurrence of the specific conditions set forth in the agreements.

36.    On November 14, 2012, Grosz loaned Toptal $1,000,000 and in exchange, Toptal and Grosz entered into a standalone note purchase agreement (the "NPA") and a Convertible Promissory Note (the "CPN") which was issued pursuant to the NPA and had a Maturity Date of May 14, 2014.

37.    The NPA specified that Grosz would potentially be entitled to receive shares in Toptal – but only upon a "Next Equity Financing" which, as set forth in

the NPA, was contingent upon, *inter alia*, Toptal being converted into a class C Corporation.  It also granted Grosz the right to elect to receive equity (instead of being repaid his principal and interest) fifteen days prior to the Maturity Date, which was May 14, 2014, if a Next Equity financing had not yet taken place.

38.     The NPA also specified that an event of default would include Toptal's failure to repay the principal or unpaid accrued interest for more than thirty days after the Maturity Date of May 14, 2014.

39.     The CPN further provided that interest on the loan would accrue at a rate of 4% per year, and that it was convertible into an equity interest in Toptal but only in accordance with the terms of the NPA.

40.     If those conditions precedent did not occur, then Grosz was only entitled to the principal amount under the CPN plus accrued interest upon the Maturity Date and was not entitled to conversion of his loan into any equity.

41.     In connection with lending Toptal money, Grosz also entered into an Advisor Agreement with Toptal on the same day as he entered into the NPA and CPN.  The Advisor Agreement, pursuant to which Grosz agreed to act as an advisor to Toptal, provided, among other things, that Grosz was prohibited from (1) competing or preparing to compete with Toptal, or assisting others to do so, (2) soliciting personnel from Toptal or encouraging them to devote less than their full time to Toptal, or (3) using any confidential or proprietary Toptal information

11

except in rendering services to Toptal.  Pursuant to the Advisor Agreement, Grosz received the right to purchase 1.5% equity in Toptal at the then fair market value if certain conditions were met, including Toptal's conversion to a class C Corporation.

42.    It is a routine business practice for companies to require advisors (such as Grosz) who are given access to a company's business plan, confidential and proprietary secrets, and access to key personnel to sign agreements prohibiting them from using the company's ideas and confidential information for their own purposes, or from cherry picking the company's top performers and taking those ideas and people to compete against it (or help someone else compete against it). Grosz's Advisor Agreement with Toptal reflected this routine business practice.

43.    It is undisputed that Toptal has never been converted into a class C Corporation and likewise undisputed that Grosz did not request any shares in Toptal or seek to make any election to forego repayment of principal and interest in exchange for a right to receive equity in Toptal in the fifteen days preceding May 14, 2014 when the loan represented by his CPN matured.

*Grosz Embarks on an Orchestrated Plot to Harm Toptal and Steal its Business*

44.    Since issuing Grosz's note, Toptal has grown substantially.  It currently serves over 1,000 clients in more than a dozen countries.  It has achieved

12

this growth organically – by using revenue generated from its business to fund its expansion.

45.    Having been able to fund its own growth, Toptal has not needed to raise funding by granting equity to others, and relatedly has not needed to convert into a class C corporation.  Thus, the conditions under which Toptal's convertible notes, including Grosz's, were convertible into equity did not occur either before their respective maturity dates, or at any time in the decade or more since they matured.

46.    Grosz became dissatisfied with the terms of the agreements he made with Toptal, since the conditions that would potentially give him a right to convert his CPN into equity had not occurred.  After Toptal rejected Grosz's proposal to renegotiate the terms of his contractual arrangements, Grosz embarked on a campaign to weaken Toptal with the aim of seizing control and to gain the equity interest he desired but to which he was not entitled, or, alternatively, to bankrupt it and steal its proven business plan, key personnel, and future profits for himself. This plot, which he clandestinely put into motion in brazen violation of his contractual obligations to Toptal as a trusted advisor, included setting up a competing company (Mechanism) that was expressly designed to capitalize on the harms to Toptal that Grosz set out to cause by, among other things, orchestrating a negative media campaign against Toptal.

13

47.    Thus, Grosz attempted to illegally secure equity in Toptal for himself, or failing that, to steal Toptal's future business and financial prospects for himself through actions, many of them set forth in writing, that have now been proven in court to have been part of a malicious and fraudulent plan orchestrated by Grosz to turn Toptal into a distressed asset unable to resist a hostile takeover by a private equity firm lined up by Grosz. Seizing corporate control of Toptal would allow Grosz to effect a change to the terms of his Toptal agreements and grant Grosz an equity interest in Toptal to which he had no right, or failing that, to bankrupt the company and steal Toptal's economic value for the benefit of the new competitor Grosz was creating and which he had carefully staffed with former key Toptal personnel who would be able to recreate Toptal's innovative operations under Grosz's command and for his personal benefit.

48.    Indeed, in 2018, Grosz founded Mechanism to execute a business idea he had first discussed with Toptal's then-Chief Operating Officer, Breanden Beneschott, beginning in 2016, and whose ostensible generic purpose was to launch startups.  But after its organization, Mechanism operated in 'stealth mode' and clandestinely solicited and hired former and current Toptal employees and other key personnel, including Mr. Beneschott, and generally engaged in efforts to sabotage Toptal.

49.     In addition to trying to harm Toptal by luring away its employees and other key personnel, Grosz and Mechanism, in concert with others, also "groomed" a reporter at *The Information*, an online news source prominent in the technology space, to write stories that would harm Toptal's public reputation in the hopes that that would trigger a cascade of problems for Toptal with its clients and personnel and ultimately pressure Toptal into accepting a hostile buyout from financiers friendly to and lined up by Grosz and his confederates.

50.     As part of these efforts, Grosz orchestrated the publication of a highly damaging article.  That orchestration involved coordinating with other lenders to Toptal on what to say in response to questions from the reporter.  Eventually, *The Information* published an article entitled "At Booming Toptal, No Stock for Employees or Investors." That article includes the false statement that early contributors to Toptal "collectively gave Toptal $1.5 million in seed funding seven years ago, entitling them to around 15% of Toptal's stock," and the false report that Toptal's failure to cause a liquidity event to occur was a breach of trust and failure to deal fairly.

51.     *The Information's* Article was heavily publicized and advertised, and *The Information* noted that it was its most widely viewed news story for 2019.

52.     *The Information* launched a paid advertising campaign shortly after its Toptal article was published in which it used that article, and the name, image, and

15

likeness of Toptal's CEO, Taso Du Val, to promote a business partnership with Bloomberg and drive online consumer traffic to the *The Information's* social media account on Instagram where the only displayed link was the one that promoted "A Bundle With Bloomberg."

53.    The "bundle" was a business relationship between *The Information* and Bloomberg.com that allowed subscribers to purchase access to both news sources as a bundle, priced at a significant discount compared to subscribing to each individually.[3]  The relationship between Bloomberg and *The Information* was noteworthy and reported on by other online news sources.[4]

54.    The article published by *The Information* falsely describes the terms of the agreements entered into between Toptal and the convertible noteholders, including Grosz.  Contrary to *The Information*'s article, nobody was "entitled" to ownership of 15% (or any) of Toptal's stock, and Toptal's failure to cause a liquidity event did not breach any obligation or relationship of trust with anyone.

---

[3] *See* A Bundle with Bloomberg Media, The Complete Business Package: A Bundle with Bloomberg, dated Feb. 19, 2020, *available at* https://www.theinformation.com/articles/a-bundle-with-bloomberg-media
[4] Kayleigh Barber, "The Information is testing a subscription bundle with Bloomberg Media", dated Feb. 19, 2020, available at https://digiday.com/media/information-testing-subscription-bundle-bloomberg-media/

55.    In addition to being used to promote the subscription bundle with Bloomberg, the article in *The Information* led to follow-on news stories regarding Toptal and spawned a "#boycottoptal" campaign on Twitter and LinkedIn to discourage potential clients from doing business with Toptal.

56.    The negative publicity engendered by the article in *The Information*, the follow-up articles, and the boycott campaign led to Toptal losing contracts with clients and the services of at least one senior leadership team member, who expressly cited *The Information*'s article in announcing his decision to leave Toptal in August 2019 (but who did not acknowledge that he was resigning to join Grosz's new company, Mechanism, which was still operating in "stealth mode").

57.    Once Mechanism came out of stealth mode in March 2020, and dozens of former Toptal personnel nearly simultaneously updated their public LinkedIn profiles to reveal they were now working for a Grosz-owned company, and the scope and far-reaching nature of Grosz's violations of his Advisor Agreement became apparent for the world to see, Toptal determined that it needed to part ways with Grosz, who was anything but a trusted advisor.

58.    Toptal tried to amicably end its relationship with Grosz by terminating the Advisor Agreement and attempting to repay an amount equal to the principal and accrued interest under the NPA and CPN.

17

59.    Toptal's counsel sent Grosz a letter stating that Toptal was prepared to wire $1,335,936.90 to Grosz as soon as Grosz provided wire instructions.  This amount would have represented a return on Grosz's initial $1,000,000 loan of approximately 33.6 per cent.

60.    Grosz rejected Toptal's efforts to repay the amount equal to the principal and accrued interest under the CPN, despite the fact that the CPN had matured and therefore had become due and payable years earlier in May 2014.

<em>Toptal Files Suit against Grosz and Mechanism in Nevada</em>

61.    Once Grosz's company came out of stealth mode in March 2020, and the brazen contractual violations, bad faith, and tortious conduct of Grosz and Mechanism were revealed, Toptal commenced the Nevada Action on March 27, 2020 against Grosz (then a Nevada resident).  Subsequently, Toptal amended its complaint (twice), including to add claims against Mechanism.  Redacted copies of the complaints Toptal filed in the Nevada Action are publicly available through the Nevada court electronic filing system.[5]

---

[5] At one point, McBride contended that it was "complicated" to obtain public filings from the Nevada Action.  However, according to the Washoe County Court's website, records are available by submitting an online request and using the online payment portal: https://www.washoecourts.com/resourcecenter/CopiesCourtRecords#:~:text=Mail%20the%20request%20to%20the,Reno%2C%20NV%2089501 Regardless, even if McBride did find it "complicated" to obtain publicly available court records directly from the Nevada State Court, she and Du Val were in communication

18

62.    In the publicly available complaints, Toptal set forth the relevant terms of the NPA and Advisor Agreement it had entered into with Grosz, detailed Grosz's efforts to sabotage Toptal and asserted various claims against Grosz and Mechanism based on their tortious conduct and Grosz's bad faith and egregious violations of his contractual obligations.

63.    In its Second Amended Complaint, Toptal asserted claims for (1) breach of contract against Grosz based on the advisor agreement; (2) tortious interference with a prospective economic advantage against Grosz; (3) business disparagement against Grosz; (4) contractual breach of the covenant of good faith and fair dealing against Grosz; (5) tortious breach of the covenant of good faith and fair dealing against Grosz; (6) tortious interference with contractual relations against Mechanism; (7) civil conspiracy; and (8) declaratory judgment.

64.    Grosz and Mechanism asserted various counterclaims against Toptal and Du Val personally alleging, *inter alia*, that Toptal had breached the terms of the agreements between the parties and that Du Val had fraudulently induced Grosz to enter into the agreements.

65.    After the parties cross moved for summary judgment on various of the claims, the trial court in the Nevada Action (the "Nevada Court") issued public

---

regarding the Article in the months prior to its publication and Du Val emailed her the publicly filed court records in response to her requests.

19

decisions on the motions vindicating Toptal, dismissing the counterclaims brought against Du Val personally and denying Grosz and Mechanism relief.

66.     Of particular importance, on October 11, 2023, the Nevada Court determined that while Grosz had received the *contingent* right to purchase 1.5% equity in Toptal *if* certain conditions were met, those conditions had "not occurred."  Thus, Toptal had not breached its contractual obligations in declining to give equity to Grosz.  A copy of the Nevada Court's decision on Toptal's motion for summary judgment is attached as Exhibit 1 (the "Toptal Summary Judgment Decision").[6]

67.     In the Toptal Summary Judgment Decision, the Nevada Court found that a Next Equity Financing did not occur prior to the Maturity Date of the CPN and had not taken place as of the date of the Summary Judgment opinion.

68.     The Nevada Court also rejected Grosz's argument that the CPN created a "perpetual option to elect to convert his Note to equity."  In so holding, the Nevada Court cited authority for the proposition that such perpetual rights are "about as common as polar bear sightings in Death Valley," and held that the contract could only reasonably be read to have allowed a 15-day conversion period – the 15-day period preceding the Maturity Date, after which the CPN became due

---

[6] The Nevada State Court also issued orders granting Du Val's motion for summary judgment and denying in part and granting in part Mechanism's motion for partial summary judgment.

and payable as a matured loan. There was no dispute that Grosz did *not* make an election to convert the CPN prior to the Maturity Date.

69.     The Nevada Court went on to make the alternative finding that the NPA and CPN did not "grant Mr. Grosz the ability to force Toptal to change its corporate form in response to his election." The Nevada Court went on to determine that "it would be unreasonable to interpret the agreement in a way that would allow a lender of matured debt the perpetual right to force a company to undertake a complete corporate restructuring," and went further to hold that Grosz's interpretation of the CPN "that he, as a single lender with a convertible promissory note, could force Toptal to undergo a complete restructuring at his whim and continuing perpetually into the future would produce an absurd result."

70.     Thus, the Nevada Court concluded that Toptal did <u>not</u> breach the terms of its contractual agreements with Grosz, finding in the Toptal Summary Judgment Decision "that the terms of the NPA and Note, as well as settled California law, establish that *Mr. Grosz's Note became due and payable on the Maturity Date and that Toptal was within its rights to return an amount equal to Mr. Grosz's principal and accrued interest in March 2020*. Summary judgment is granted to Toptal on this theory of breach." (emphasis added)

71.     The parties then proceeded to trial on the remaining claims.

21

72.     As revealed by the publicly available court documents, a jury verdict was rendered on November 10, 2023 in the Nevada Action in Toptal's favor and against Grosz on Toptal's claims for breach of contract and breach of implied covenant of good faith and fair dealing, and Toptal was awarded $535,270 in compensatory damages and pre-judgment interest in the amount of $132,933.76, for a total judgment of $668,203.76.  In that same verdict, Grosz's counterclaims against Toptal were dismissed.

73.     Similarly, publicly available documents show that following the jury trial, a verdict was rendered on November 10, 2023 in the Nevada Action in Toptal's favor and against Mechanism on Toptal's claims for Intentional Interference with Contractual Relations, and Toptal was awarded $535,270 in compensatory damages and pre-judgment interest in the amount of $98,955.29, for a total judgment of $634,225.29.

74.     Because the jury had determined that Grosz's company, Mechanism, had acted with "malice, oppression, or fraud," the jury was brought back the following day for a one-day jury trial on the question of punitive damages.  After hearing from both sides, including a refusal by Grosz to apologize to Toptal, Du

Val, or Toptal's employees, the jury awarded Toptal punitive damages of

***$15,000,000.00*** against Mechanism Ventures.[7]

75.    Following the jury decision, Grosz and Mechanism both filed post-trial motions for new trials or to alter or amend the judgment.  In decisions dated April 22, 2024, the Court rejected these motions and affirmed the jury verdicts.  A copy of the Court's decision denying in part and granting in part Grosz's motion is attached as Exhibit 2 (the "Grosz Post-Trial Decision").  A copy of the Court's decision denying in part and granting in part Mechanism's motion is attached as Exhibit 3 (the "Mechanism Post-Trial Decision").

76.    Grosz and Mechanism have appealed the judgments against them, and those appeals remain pending.

---

[7] The jury's punitive damages award was later reduced by the Nevada Court to $1,600,000 in a decision dated April 22, 2024.

*Bloomberg Purports to Report on the Nevada Litigation*

77.     In late 2023, Bloomberg, via McBride, reached out to Du Val regarding the dispute between Toptal and Grosz.  In her initial messages, McBride admitted that while she had seen the court docket, she had not yet reviewed the specific court filings – critical documents necessary to understand the nature of the dispute.

78.     Over the following months, Du Val and McBride communicated several times, during which Du Val provided McBride with information about the case and its underlying facts.  Du Val sent McBride copies of voluminous court filings, including motion papers, and the Nevada Court's decisions on the various motions.

79.     In her correspondence with Du Val, McBride revealed generally that she was drawing conclusions about the underlying facts based on self-serving arguments made by Grosz in his court papers, rather than on the legal rulings and factual determinations made by the neutral court and jury – which had roundly rejected Grosz's self-serving arguments.   For instance, on January 25, 2024, McBride sent Du Val an email noting that Grosz's response filed in the suit "says Grosz had the right to force a conversion of his note to equity because of the optional conversion clause."  Then, McBride asked Du Val a rhetorical question suggesting that she ignored the finding of the court and instead adopted Grosz's

24

self-serving position that had been rejected by the court: "wasn't Grosz entitled to get common stock, since he eventually asked for it?  The agreement says 8.333%."

80.    But three months before McBride sent this email, the Court, in the publicly available Toptal Summary Judgment Decision, rejected Grosz's interpretation of the CPN and, on the contrary, held that "Section 2.2(b) of the NPA does not grant Mr. Grosz a perpetual option to elect to convert his Note to equity."

81.    As updates occurred in the post-trial stages of the litigation, Du Val would inform McBride.  For example, on January 31, 2024, he informed her that Toptal had filed an opposition to Grosz and Mechanism's request to stay briefing on Toptal's motion for fees and costs as the prevailing party in the litigation.

82.    In sharing those papers, Du Val highlighted that Toptal's opposition to Grosz's motion revealed that in an effort to settle the litigation, Toptal "offered Grosz approximately 10x his investment in a binding non-rescindable offer," but that Grosz "didn't accept the offer, of course, and still went full steam ahead with his counter claims and he lost on all of them."

83.    McBride thanked Du Val for sharing Toptal's opposition to Grosz's motion to stay briefing on the fee motion, and asked "What made you file the motion now and not as part of the main trial?" – thus revealing that she either had no understanding of how court proceedings generally work (i.e. that fees may only

25

be sought after a party has prevailed and shown its entitlement to such fees) or had no interest in reviewing the court filings that Du Val had sent her and had no idea what motion to which he was referring.

84. After Du Val explained that the papers he had just shared were a "post [trial] motion relating to the fees [Toptal is] entitled to as a result of the trial," McBride responded: "Wow. The lawyers must be loving all this."

85. On February 13, 2024, McBride wrote an email to Adam Mendelsohn at Upland Workshop regarding how she would describe the CPN and saying that "although the note matured in May 2014, the provision that allows the principal and interest to convert into equity is still valid," and asking him to let her know if any part of that was incorrect. Thus, McBride continued to express a legal conclusion about Grosz's purported right to obtain equity, even though she knew, or was at least reckless to the fact that the legal conclusion she expressed had been unequivocally and flatly rejected by the Nevada Court months earlier in the Toptal Summary Judgment Decision.

86. After Mendelsohn forwarded the email from McBride to Du Val, Du Val wrote to McBride and explained the legal significance of the October 2023 Toptal Summary Judgment Decision. Specifically, Du Val informed McBride that the judge had ruled that "the conversion rights expired after the maturity date," and thus it was a "legal conclusion that the conversion rights expired in 2014."

Documenting these facts, Du Val sent McBride a copy of the Toptal Summary Judgment Decision.

87.    The Toptal Summary Judgment Decision which Du Val had sent McBride (and which had been publicly available for months), made clear the Nevada Court's ruling in October 2023 that Grosz could not prove breach of contract against Toptal because: (1) "Section 2.2(b) of the NPA does not grant Mr. Grosz a perpetual option to elect to convert his Note to equity;" (2) "the NPA does not grant Mr. Grosz the ability to force Toptal to change its corporate form in response to his election;" (3) "Toptal … did not breach by attempting to pay Mr. Grosz an amount equal to the principal and accrued interest on March 26, 2020, nearly six years after the Note's Maturity Date;" and (4) "the terms of the NPA and Note, as well as settled California law, establish that Mr. Grosz's Note became due and payable on the Maturity Date and that Toptal was within its rights to return an amount equal to Mr. Grosz's principal and accrued interest in March 2020."

88.    These findings by the Nevada Court, of which McBride was aware, directly contradict her statement that "the provision that allows the principal and interest to convert into equity is still valid." Thus, she either read the conclusions of Nevada Court decisions that Du Val sent her and nevertheless willfully decided to ignore them, or was at least reckless to the facts by making herself deliberately blind to the conclusions of the court she was purporting to describe.

27

89.    Du Val further highlighted for McBride that noteholder actions prior to the lawsuit showed that they understood that the conversion rights had expired upon maturity since they had asked Toptal to extend the maturity date to re-activate their conversion rights.

90.    Throughout their correspondence, McBride showed a shocking ignorance of and recklessness to the status of the court proceedings.  For example, on March 11, 2024 she and Du Val had the following exchange, after which Du Val offered to have a phone call with her to "explain":



91.    Almost a month later, McBride continued to show a complete lack of knowledge regarding the status of the litigation and what relief had (or had not been sought) as evidenced by the following exchange where she indicated in her question to Du Val that she believed Du Val and Toptal had already filed a post-trial motion asking for their fees:



92.    A simple review of the public docket would have shown McBride what motions had (or had not) been filed at any point in time.

93.    Shortly before Bloomberg published the Article and Opinion Column, Du Val informed McBride that the post-trial motions had been decided in Toptal's favor and sent her copies of the decisions both by WhatsApp and email.

94.    The next day, McBride again messaged Du Val regarding the pretrial motions which the Court had ruled on months before, thereby showing both her complete unwillingness to recognize that the Toptal Summary Judgment Decision had determined that the CPN had matured and that Grosz's conversion rights had lapsed, and her lack of knowledge regarding what happens when a decision is appealed:

30



95.    Finally, on April 24, 2024, after the judgments had been entered against Grosz and Mechanism, Bloomberg published the article authored by McBride with the headline "Battle Over Startup Leaves Early Investor With No Equity, $2.6 Million Legal Bill." (the "Article").  A copy of the Article is attached as Exhibit 4.

96.    At the time that Bloomberg published the Article, the Nevada Court's summary judgment opinion and the jury verdict from the Nevada Action were publicly available.  Bloomberg was aware of these court filings as it was

31

purporting to report on the Nevada Action: not only were the filings publicly available, but Du Val had separately emailed many of the filings to Bloomberg via McBride. Yet, the Article contains many statements which are not only demonstrably and materially false, but whose falsity was known to Bloomberg at the time of publication given the content of the Nevada Court's summary judgment opinions and the jury verdicts that were known to Bloomberg when the Article was published.[8]

97.    Despite access to court filings which showed that (1) Grosz was not entitled to any equity interest in Toptal; (2) Toptal attempted to pay back an amount equal to the principal and interest under Grosz's CPN which equated to an approximately 33.6% rate of return; (3) Toptal was harmed by Grosz's and Mechanism's tortious and bad faith conduct and awarded damages to compensate for its losses; and (4) Toptal was initially awarded $15,000,000.00 in punitive damages against Grosz's company, Mechanism, due to actions that the jury determined were taken with "malice, oppression, or fraud," the Article contains multiple material false statements regarding the underlying Nevada Action and the agreements between Grosz and Toptal.

---

[8] While Grosz and Mechanism have appealed from parts of the summary judgment decisions and the jury verdicts, those appeals remain pending. Thus, at the time that the Article was published, the summary judgment decisions and the jury verdicts were (and remain) the controlling decisions regarding the dispute between Toptal and Grosz.

32

98.    For instance, the Article alleges that:

When Denis Grosz invested in software startup Toptal LLC in 2012, he hoped the $1 million bet could one day make him a fortune.

Instead, it landed him on the receiving end of a lawsuit, leading to more than $2.6 million in damages against him and his new firm and possibly tens of millions more in legal fees.

But the Article was intentionally misleading in presenting Grosz as someone who had made a "investment in" and "bet" on Toptal.  To the contrary, Grosz did not invest in Toptal, he entered into a convertible promissory note with Toptal and it was not Grosz's purported "investment" that "landed him on the receiving end of a lawsuit," but rather the lawsuit stemmed directly from Grosz's now-proven deliberate and malicious plot to harm Toptal and the actions he took in bad faith and in violation of his contractual obligations.  Indeed, as the Nevada Court found, the plot against Toptal was "*led by Mr. Grosz*."

99.    McBride and Bloomberg *knew* the above statements in the Article were false and did not report accurately on the underlying Nevada Action since they had access to the complaints, counterclaims, judicial opinions on the motions for summary judgment, the jury verdict, and the post-trial decisions.

100.    Similarly misleading is the allegation in the Article that:

At issue is a challenge to a fundamental convention in Silicon Valley: whether the startup has denied early investors a return by refusing to switch their decade-old convertible debt commitments into equity, tying up their holdings even as the company has flourished.  Without

33

> equity, they can't sell their interest in Toptal, making their outlay worth little more than the day they invested.

However, McBride and Bloomberg *knew* this allegation is demonstrably false as (1) the lenders to Toptal such as Grosz do not have any holdings "tied up" in Toptal as their respective notes have matured and Toptal is prepared to repay amounts equal to the principal and accrued interest of any such loans that have not already been repaid – as evidenced by Toptal's efforts to repay the loan Grosz made with interest; and (2) the loans are not "worth little more" than the day they were made as evidenced by the approximate 33.6% return that Grosz would have received had he not rejected Toptal's efforts to repay an amount equal to the principal and accrued interest in respect of his loan.

101. Toptal's tender of payment to Grosz, and the return of 33.6% he would have received, were detailed in the public record. Prior to reporting *on the litigation* between Toptal and Grosz, a responsible journalist not acting recklessly would have read the litigation's controlling decisions – the court's decisions on the various summary judgment motions, the jury verdict, and the court's decisions on the post-trial motions. Had Bloomberg done that here, it would have known that the disparaging statements it was publishing were false and inconsistent with the outcome of the litigation it was purporting to report on for its readers. To the extent that Bloomberg failed to do so, it showed a deliberate, or at least a reckless

34

disregard for the truth because not only were the decisions from the Nevada Action publicly available, but Du Val had actually sent copies of them to McBride.

102.   Equally false was the Article's characterization of the agreement between Grosz and Toptal which it summarized as:

> Grosz's deal included rights to around 10% of the company after its first equity financing.  But Grosz didn't get his stake: Toptal never raised more equity, and a conversion never happened.

The above statement is demonstrably false insofar as it states that Grosz had a "deal" with Toptal that gave him "rights" to 10% in equity in Toptal.  Instead, as determined by the Nevada Court, Grosz *never* acquired a right to obtain equity in Toptal.

103.   McBride and Bloomberg knew that Grosz did not have a non-contingent right to equity in Toptal due to the summary judgment decision in the Nevada Action (which Du Val sent to McBride and was publicly available) and thus the Article's reporting that Grosz had a non-contingent right to 10% of Toptal was demonstrably false and published with a knowing and reckless disregard for the truth.

104.   Finally, the Article's statement that Grosz continues to have the right to seek equity in Toptal is false and defamatory.  Specifically, the Article alleges that:

> Grosz could still see an equity conversion – Toptal raising more money would trigger one – but Du Val said in an interview that it

35

doesn't make sense, in part due to tax reasons, to pursue that now. Grosz has never asked for his money back, according to his countersuit. Toptal tried to pay it back with interest in March 2020, according to his and Toptal's suits, but Grosz rejected the attempt.

105. This statement is flatly contradicted by the Summary Judgment Decision insofar as it concluded that the CPN had matured and was therefore due and payable and that Toptal was well within its rights to repay an amount equal to the principal and accrued interest under the CPN and that Grosz had no right under the contract to reject Toptal's payment. Thus, Grosz *cannot* still "see" an equity conversion and the implication that Toptal continues to deny Grosz an equity interest to which he is otherwise entitled is false and defamatory *per se*.

106. Bloomberg's publication of the notion that the CPN granted Grosz a perpetual option to convert the CPN to equity, even after Bloomberg was aware that the Nevada Court had flatly rejected this argument and explained that such perpetual options are "about as common as polar bear sightings in Death Valley," reinforces the conclusion that Bloomberg was at least reckless in reporting that the agreements conferred such a perpetual option on Grosz.

107. Notably, although Bloomberg was purporting to report on the Nevada Action, at no point did the Article quote any of the findings of the Nevada Court. Instead, the Article contained its own, inaccurate, description of the findings rather than including any of the actual language from the court decisions.

36

108.    That the reasonable reader would view the Bloomberg Article as reporting that Grosz was harmed by Toptal's bad acts including the purported denial of a "right" of Grosz to equity in Toptal is confirmed by the statements and actions of others following the Article's publication.

109.    For example, at the time of publication, Toptal was in the process of hiring for a key senior role and had identified a leading candidate.  However, when on April 25, 2024, Toptal's Head of Recruiting emailed the candidate to set up an interview with Toptal's CEO, the candidate declined and stated that he was withdrawing his candidacy.  In the email withdrawing his candidacy, the candidate included a link to the Article and stated that what he had read on Bloomberg about Toptal "presented some cause for concern."

110.    On the same day that the Article was published, Bloomberg also published the Opinion Column by Matt Levine which repeated many of the false and defamatory allegations.  A copy of the Opinion Column as originally published is attached as Exhibit 5.

111.    Notably, the Opinion Column was entitled "The FTC Comes for Noncompetes," but included a summary of the Article even though it had *nothing* do with noncompetes.

112.    While the Opinion Column provided its own gloss on the Nevada Action, it repeated several of the defamatory allegations in the Article.

37

Specifically, the Opinion Column repeated the materially false and defamatory allegations that:

> Grosz's deal included rights to around 10% of the company after its first equity financing.  But Grosz didn't get his stake: Toptal never raised more equity, and a conversion never happened. …

> Grosz could still see an equity conversion – Toptal raising more money would trigger one.

113.    The Opinion Column also repeats the Article's allegation that Grosz "rejected" the attempt to pay him an amount equal to the principal and accrued interest, without informing the reader that the Nevada Court had ruled that Toptal did not breach its agreements with Grosz by doing so but was instead well within its rights under the contract.  In short, the Nevada Action had proved that *Grosz* was the one who had not honored his contractual obligations and had sought to wrongfully extract financial rewards for himself at the expense of *Toptal*—not the other way around as Grosz had unsuccessfully and indeed preposterously argued in the Nevada Action, and as Bloomberg was misinforming the world.[9]

---

[9] The Article was also published in Spanish and Portuguese for Bloomberg's audience around the world.  *See*, *e.g.* https://www.bloomberglinea.com/2024/04/27/batalla-por-una-startup-deja-a-primer-inversor-sin-capital-y-con-una-factura-legal-de-us26-millones/ (Spanish); https://www.bloomberglinea.com.br/startups/este-investidor-colocou-us-1-mi-em-uma-startup-hoje-deve-us-26-milhoes/ (Portuguese).  On information and belief, Bloomberg did not attempt to make any changes to the foreign language versions of the Article when it made changes to the English Article.

114.   Just as Bloomberg published the Article with knowledge or reckless disregard that the above statements were false, it also published the Opinion Column knowing or with reckless disregard that the allegations contained therein were false.  Had Bloomberg faithfully reported on  the underlying public documents from the Nevada Action, it would have reported the actual facts which were the exact opposite of the Article's false conclusions, i.e., that (1) Grosz never had a "right" to equity in Toptal, and (2) any chance that Grosz had to an equity conversion had expired many years prior when the CPN matured in 2014.

115.   The Opinion Column further underscored the false narrative that Toptal was a company that had wrongfully deprived Grosz and other third-parties of an equity interest.

116.   After the Article and Opinion Column were published, Toptal reached out to Bloomberg to attempt to have the false and defamatory allegations corrected. Eventually, Bloomberg published a revised article on June 14, 2024 which changed the headline of the article to "A $1 Million Bet on a Tech Startup Spawns Investor-Founder Fight" and removed the paragraph stating that Grosz could still receive equity if the necessary conditions were met, but otherwise left the Article the same (the "Revised Article").  As a result, many of the false defamatory statements remain in the Revised Article.  A copy of the Revised Article is attached as Exhibit 6.

39

117.    Since the Revised Article only attempted to correct two of the various false statements and left many of the other false and defamatory statements intact, the Revised Article continues to portray the dispute as caused by Toptal and in which Grosz/Mechanism are the purported victims.  Additionally, the revisions that Bloomberg made did not diminish the defamatory sting of the Article.  Indeed, by removing the false statement that Grosz could still receive an equity interest without also removing the false statements that Grosz was entitled to such an interest and that he had been harmed by Toptal, Bloomberg compounded the harm by leading the reasonable reader to wrongfully conclude that Grosz had been cheated out of an equity interest and there was no chance of recovery.

118.    For instance, the revised headline continues to misrepresent the nature of the underlying Nevada court case.  The Revised Article's headline reads: "A $1 Million Bet on a Tech Startup Spawns Investor-Founder Fight."

119.    Thus, a reasonable reader would understand from the Revised Article's headline that the Nevada Action had been filed because of the existence of a so-called "Bet" – which itself is an inaccurate description of the loan made by Grosz to Toptal.  However, the Nevada Action was initiated by Toptal, and the reason Toptal initiated it was that, as the Court later concluded, Grosz brazenly and in bad faith violated his contractual obligations to Toptal, including under his Advisor Agreement (*not* the other way around), and that Mechanism had engaged

40

in a course of conduct intended to harm Toptal that a unanimous jury concluded amounted to "malice, oppression, or fraud" that warranted a $15 million punitive damages award.  While Grosz and Mechanism asserted counterclaims based on the note, those claims did not "spawn" the litigation since they were only asserted as counterclaims *after Toptal had sued Grosz*, its supposed trusted advisor, once the scope and nature of his nefarious and now-proven actions came to light.

120.   Additionally, by continuing to describe Grosz as an "investor," the Revised Article misstates Grosz's contractual relationship with Toptal in a light that is false as to Toptal because it perpetuates the by-then debunked narrative that Toptal somehow cheated or robbed Grosz of equity – equity to which he had been proven in court to have no legal right and ignores that Grosz was also an adviser to Toptal who breached his contractual duties in bad faith.

121.   The Revised Article left the following allegations which are defamatory and were published with a knowing and reckless disregard for the truth for the reasons set forth above:

> When Denis Grosz invested in software startup Toptal LLC in 2012, he hoped the $1 million bet could one day make him a fortune.
>
> Instead, it landed him on the receiving end of a lawsuit, leading to more than $2.6 million in damages against him and his new firm and possibly tens of millions more in legal fees.
>
> At issue is a challenge to a fundamental convention in Silicon Valley: whether the startup has denied early investors a return by refusing to switch their decade-old convertible debt commitments into equity,

41

tying up their holdings even as the company has flourished.  Without equity, their outlay is worth little more than the day they invested.

….

Grosz's deal included rights to around 10% of the company after its first equity financing.  But Grosz didn't get that stake: a conversion never happened.

122.   Notably, the Revised Article changed the paragraph regarding whether Grosz could still expect to receive an equity conversion to read:

Grosz cannot currently expect an equity conversion, unless his ongoing appeal to overturn part of the court's decision is successful.  Besides, Du Val said in an interview that it doesn't make sense to pursue a conversion now, in part due to tax reasons.  Grosz has never asked for his money back, according to his countersuit.  Toptal tried to pay it back with interest in March 2020, according to his and Toptal's suits, but Grosz rejected the attempt.

123.   The information leading to this revision – from a statement that "Grosz could still see an equity conversion" to a statement that "Grosz cannot currently expect an equity conversion, unless his ongoing appeal to overturn part of the court's decision is successful" – had been brought to McBride and Bloomberg's attention *months* prior to the Article's original publication.  Specifically, that change was required because the original statement was directly contrary to the facts set forth in the Toptal Summary Judgment Decision rendered in October 2023.

42

124.   Bloomberg also changed that paragraph in the Opinion Column, publishing a revised opinion column on June 15, 2024 (the "Revised Opinion Column").  A copy of the Revised Opinion Column is attached as Exhibit 7.

125.   The Revised Opinion Column continued to repeat the defamatory allegation that "Grosz's deal included rights to around 10% of the company after its first equity financing.  But Grosz didn't get his stake: Toptal never raised more equity, and a conversion never happened. …"

126.   Following publication of the Revised Article and Revised Opinion Column, Toptal again reached out to Bloomberg to request that additional modifications be made to remove the defamatory statements.  Bloomberg refused to make any additional changes, insisting that the Revised Article reflected its "editorial bent."  Bloomberg gave no valid explanation for why its asserted "editorial bent" justified continued publication of materially false and defamatory statements about Toptal that Bloomberg knew were at odds with the conclusions of the court in the Nevada Action.  These false and defamatory statements served to continue and reinforce the negative media campaign involving *The Information* (which at the time had a business relationship with Bloomberg) that had been proven in the Nevada Action to have been "orchestrated" by Grosz and calculated to harm Toptal.  Thus, Bloomberg's reliance on its "editorial bent" to justify its refusal to make further changes to the Article and Opinion Column highlights that

43

Bloomberg's publication of the defamatory statements was done to further its own agenda and not to accurately report on the Nevada Action.

127.   Underscoring the egregiousness of Bloomberg's malice, before publication Du Val had specifically informed its reporter, McBride, that Grosz was *not* entitled to an equity share in Toptal for the reasons detailed in the Toptal Summary Judgment Decision, which Du Val had sent McBride months before the Article's original publication.  McBride and Bloomberg's description of the contractual language between Toptal and Grosz as giving Grosz a right to equity in Toptal evinced actual malice: based on the content of the court documents in the Nevada State Court Action, Bloomberg either knew that that was false or at minimum, acted with reckless disregard to whether or not it was true or false.

128.   Additionally, the Revised Article and Revised Opinion Column continue to report that Grosz had "rejected" Toptal's efforts to repay the principal and accrued interest under the CPN without reporting that the Nevada Court had ruled that Toptal was <u>entitled</u> to repay an amount equal to the principal and accrued interest.

129.   That the Revised Article did not change the overall defamatory meaning of the Article has been demonstrated by the statements and actions of third parties who read the Revised Article.  Recently, a potential business partner declined to move forward with Toptal and specifically cited the Revised Article as

44

grounds for the refusal to move forward stating in an email to Du Val that "[t]he [Bloomberg] article makes it clear that you denied one of your early investors a right to receive equity, which resulted in the lawsuit.  While I understand that you've told me that it was the fact that the investor, acting in the capacity of an advisor, was perpetuating malicious acts against Toptal, it doesn't appear that way from my reading."

130.    Thus, Toptal's prospective business partner declined to move forward because the Revised Article painted Toptal as an entity which "denied one of [its] early investors a right to receive equity," and even though the lawsuit resulted in findings that Grosz (1) had engaged in a malicious campaign to harm Toptal and (2) was never entitled to receive equity under the terms of the agreement.

131.    Du Val has been told by others in the business community that the Bloomberg Article has been mentioned as a source of grave concern that reflects negatively on Toptal and dissuades them from wanting to enter into business deals with Toptal – which financially harms Toptal.

132.    Highlighting the false and defamatory statements in the Article, the Opinion Column, the Revised Article, and the Revised Opinion Column, and Bloomberg's recklessness in publishing them, is a recent article and accompanying

45

video piece published by CNBC.[10]  In contrast to Bloomberg, CNBC quoted directly from the court decision in the Nevada Action and accurately portrayed the outcome of the Nevada Action, beginning with the headline which reads "How a Silicon Valley financial backer orchestrated a plot to take down a rising startup." Thus, while Bloomberg portrayed Grosz as the victim, CNBC accurately reported that Toptal was targeted and victimized by Grosz and his company and they were sued as a result of their actions, not some supposed $1 million "bet."  CNBC accurately reported that the Nevada Action led to an award against Mechanism Ventures and in favor of Du Val for $15 million in punitive damages (later reduced to $1.6 million) and $535,270 in compensatory damages due to the actions taken by Grosz and his company to harm Toptal.

133.   One of the journalists who authored the CNBC article also published a story on LinkedIn describing the dispute between Toptal and Grosz as "probably the wildest startup story [he'd] ever reported," in his "over a quarter century" covering Silicon Valley.  He succinctly summarized the Nevada Action and its outcome to date, explaining that Grosz had "lent Toptal $1 million" but "told people he didn't think he got a fair shake.  He believed he was promised a stake in

---

[10] Jon Fortt and Paige Tortorelli, *How a Silicon Valley financial backer orchestrated a plot to take down a rising startup*, published Jan. 7, 2025, *available at* https://www.cnbc.com/2025/01/07/tech-investor-denis-grosz-orchestrated-takedown-plot-of-startup-toptal.html

46

the company. So after consulting with some other investors, he executed a plan to attack Du Val's reputation, start a secret competitor to Toptal, and poach Toptal employees.  In emails, it's labeled a 'cancer patient strategy.'  Du Val sued him…And so far, Du Val has won. Grosz is appealing the jury verdict."[11]

134.   If the average reader were to compare the CNBC and LinkedIn publications with the Bloomberg publications, they would question whether they were reading about the same litigation.  For example, it is difficult to square the statement in the Revised Article that "When Denis Grosz invested in software startup Toptal LLC in 2012, he hoped the $1 million bet could one day make him a fortune.  Instead, it landed him on the receiving end of a lawsuit, leading to more than $2.6 million in damages against him and his new firm and possibly tens of millions more in legal fees." with the statement in the CNBC article that the lawsuit was precipitated by Grosz initiating "a complex scheme to cripple Toptal, seeking to force a hostile buyout or renegotiation of the previously-agreed upon terms," or the succinct summary that "so far, Du Val has won.  Grosz is appealing the jury verdict."

135.   While Bloomberg relied on its own (inaccurate) summary of the Nevada Action, CNBC quoted the decision of the court directly: "the evidence

_____

[11] Jon Fortt, *The Wildest Startup Story I've Covered: The Fight for Toptal*, published Jan. 8, 2025, *available at* https://www.linkedin.com/pulse/wildest-startup-story-ive-covered-fight-toptal-jon-fortt-oz8je/

presented at trial revealed a deliberate, purposeful plot – committed to writing – to attack Toptal, with the ultimate goal of bankrupting the company."

136. In contrast to CNBC, Bloomberg's deliberate refusal to either read or faithfully describe the publicly available court documents from the Nevada Action was reckless, at best.

## THE CAUSE OF ACTION

137. Plaintiff repeats and realleges paragraphs 1 through 136 above.

138. Bloomberg published the false and defamatory Article, Opinion Column, Revised Article, and Revised Opinion Column about Plaintiff with a knowing and/or reckless disregard for the truth and thereby caused and continues to cause Plaintiff damages.

139. The statements about Plaintiff published in the Article, Opinion Column, Revised Article, and Revised Opinion Column are false and disproven by the public record in the underlying litigation between Plaintiff, Grosz, and Mechanism.

140. The story and statements made therein are false and defamatory *per se* because they tended to injure Plaintiff in its trade, business, or profession.

141. The false statements in the Article and Opinion Column wrongly depict Plaintiff as an entity which does not honor its agreements and inflicted harm on investors.

48

142.    Prior to the Article and Opinion Column, Plaintiff had been subjected to a harmful campaign by a disgruntled individual who acted in bad faith and led others in the business community to believe that Plaintiff "stiffed" investors and led to a #boycottToptal movement.

143.    After Plaintiff brought a litigation to remedy the wrongs inflicted on it by Grosz and Mechanism and prevailed, the Article and Opinion Column undid the beneficial impact of the successful Nevada Action by publicly and falsely (but persuasively) casting Plaintiff as the villain in the litigation and reporting that it was Grosz who had been harmed by Plaintiff, and continuing to report that Plaintiff did not honor its commitments even though the Nevada court and jury had reached exactly the opposite conclusion, and in fact took the step of awarding punitive damages in view of the way in which Grosz's company had targeted and harmed Toptal with "malice, oppression, or fraud."

144.    Now, as a result of the Article, Opinion Column, Revised Article, and Revised Opinion Column, Plaintiff continues to suffer from an unfairly damaged reputation as an entity which does not honor its agreements and inflicts harm on those with whom it does business despite the fact that Plaintiff obtained a judgment in the Nevada Action that not only vindicated its position, but also demonstrated that Grosz was the one who had not honored his contractual obligations and instead had sought wrongfully and in bad faith to extract financial rewards for himself at

49

the expense of Toptal – not the other way around as Bloomberg's faulty reporting indicates.

145.   As set forth above, Bloomberg published the false statements about Plaintiff with actual malice as Bloomberg knew, or at least recklessly disregarded that they were false, since the false allegations are contradicted by publicly filed court documents in the Nevada court case, many of which Du Val had directly provided to McBride.

146.   Although Bloomberg knew or recklessly disregarded that the information in the Article and Opinion Column was false when originally published, when confronted with the falsity of its statements by Plaintiff, Bloomberg refused to retract the majority of the false and defamatory statements, thereby further demonstrating its fault in publishing them.

147.   Toptal has suffered a loss of reputation, loss of enterprise value, loss of potential business opportunities, and lost profits as a result of Bloomberg's actions.  In view of the foregoing, Toptal is entitled to actual, presumed, punitive, and other economic damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Toptal respectfully requests that the Court enter an award and judgment in its favor, and against Bloomberg L.P., as follows:

(a) awarding Toptal general compensatory damages in an amount to be determined at trial;

(b) awarding Toptal punitive damages in an amount to be determined at trial;

(c) awarding Toptal pre- and post-judgment interest;

(d) awarding Toptal all expenses and costs, including attorneys' fees; and

(e) such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: January 15, 2025

Of Counsel:

Alan S. Lewis
Madelyn K. White
CARTER LEDYARD & MILBURN
LLP
28 Liberty Street, 41st Floor
New York, NY 10005
(917) 533-2524

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Tel: 302-777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff*

51

# [Exhibits to Complaint Omitted]